**Gotshall v. Stoudt**

*Jacqueline R. Mark,* for plaintiff.
*Jeffrey J. Howell,* for defendant.

LASH, *J.,* October 10, 2006—The matter before this court is the petition of plaintiff, Cherie L. Drumheller (Mother), to modify an order of custody entered on September 26, 2000 and amended October 28, 2005. At issue is primary custody of the parties' younger child, William Robert Stoudt. Trial was held on September 27, 2006. The court enters the following findings:

## I. FINDINGS OF FACT

(1) Plaintiff, Cherie M. Gotshall (Mother), is an adult individual who currently resides at 277 Mount Olive Boulevard, Shenandoah, Schuylkill County, Pennsylvania.

(2) Defendant, David J. Stoudt (Father), is an adult individual who currently resides at 401 Grant Avenue, Leesport, Berks County, Pennsylvania.

(3) The parties are the natural parents of two minor children, Jonathan David Stoudt, born July 7, 1988, and William Robert Stoudt, born August 3, 1993. William is the subject of the within action.

(4) Mother and Father were married on December 6, 1986 and divorced on February 9, 1998.

(5) The parties separated in fall of 1995, when Mother left the marital residence. At that time, the minor children continued to reside with Father.

(6) Subsequent to the parties' divorce, Mother married Archie Drumheller in 1998. She has a daughter from Mr. Drumheller, named Samantha, born June 18, 1996.

(7) Mr. Drumheller was physically abusive to Mother and to both Jonathan and William Stoudt.

(8) On October 1, 1997, Mr. Drumheller pled guilty to simple assault, disorderly conduct and harassment based upon an assault upon the paternal grandfather, during a custody exchange at the Hamburg State Police Barracks. Jonathan witnessed the incident.

(9) Mother subsequently separated from Archie Drumheller in 2002, and the couple were eventually divorced.

(10) Mother currently resides with her third husband, William Gotshall, whom she married in March 2004, her daughter, Samantha Drumheller, and Mr. Gotshall's daughter, Victoria Gotshall, born October 8, 1993.

(11) Mother's current husband is employed as a correctional officer at the Federal Correctional Institute, Schuylkill County, located in Minersville, Pennsylvania. His shift changes four times a year. He applies for a particular shift, and receives same, conditional upon its availability, based on seniority. He is currently working 10 p.m. to 6 a.m., but will shortly switch to a 2 p.m. to 10 p.m. shift. He states he can always get a 6 a.m. to 2 p.m. shift or an 8 a.m. to 4 p.m. shift, if necessary to assist in watching the children in his household.

(12) Father resides with the minor children.

(13) The parties' child, Jonathan, is estranged from Mother and has been for approximately five years. Jonathan remains angry with his Mother for her part in the physical abuse suffered by her and the boys at the hands of Mr. Drumheller.

(14) Jonathan intends to attend college in South Dakota for ROTC and ranching, eventually looking to a career in the military. As a result, he will likely be moving from Father's home sometime in the fall of 2007.

(15) The parties are subject to a custody order entered by this court on September 26, 2000, amending a prior order dated August 29, 1997. Under the terms of the September 26, 2000 order, the parties share legal custody, Father has primary physical custody and Mother has partial physical custody three weekends a month from Friday evenings at 6 p.m. to Sunday evenings at 6 p.m. During the summer, the parties share custody on a 50/50 basis.

(16) On October 28, 2005, the court, by agreement of the parties, modified the order of September 26, 2000

to provide that Mother would have partial custody of the minor children from Friday at 5 p.m. until Sunday at 5 p.m. This change facilitated Father and William's participation in Boy Scout meetings on Sunday evenings.

(17) Father resides in the Schuylkill Valley School District, the school district William has attended for his entire education.

(18) The parties reside approximately a 45-minutes to one-hour drive apart.

(19) Mother is currently employed in real estate sales at Webb Realty, Shenandoah, Pennsylvania, maintaining flexible hours.

(20) Father is employed by East Penn Manufacturing Company, working Monday through Friday from 6:30 a.m. until 2:30 p.m., and occasionally on Saturday.

(21) The minor child does not participate in a daycare or latch key program.

(22) The minor child, William, has had difficulties in school recently. His grades have been sub par and he was suspended for fighting.

(23) William enjoys Boy Scouts. Father participates with him as a troop committee person and is involved with the Board of Review.

(24) According to the parties, William generally will obey instructions, but can become defiant and oppositional.

(25) The minor child and his brother, Jonathan, will sometimes get involved in verbal altercations, stemming from Jonathan's "picking on" William.

(26) At Father's home, the two boys reside in the same bedroom, although William has a separate room for his dresser and chest of drawers.

(27) Both of the children enjoy spending time at the farm of the paternal grandmother. They assist Father in working the farm, primarily during the summer months, although there are some weekday chores during the school year, as well.

(28) By order of October 21, 2005, the parties submitted to a psychological evaluation, performed by Peter H. Thomas Ph.D. and Associates.

(29) Dr. Thomas interviewed the parties, the parties' children, Mother's husband, her daughter, Samantha Drumheller, and her stepdaughter, Victoria Gotshall. Dr. Thomas also performed the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). He compiled a written report, dated December 19, 2005.

(30) The parties have agreed to continue a shared custody arrangement on a 50/50 basis during the summer months.

## II. DISCUSSION

In determining primary custody, this court considered the testimony of the parties, Mother's husband, William Gotshall, Mother's friend, Donna Mulligan, the exhibits submitted, the questionnaires filled out by the parties at the direction of the court and made a part of the court file, and the written evaluation of Dr. Thomas.

Mother presented first. She is seeking primary custody because she believes the minor child wants to live with her. She states that he has told her so several times.

He has also advised Dr. Thomas of this during his interview. There have been times when the minor child exhibited depression and even began crying when it was time for him to return to his father's home. She states that as a young adolescent he "craves attention."

Mother believes the reasons the minor child wants to move is because he has a poor relationship with his elder brother, Jonathan, who picks on him. She believes that Jonathan may be abusive, primarily verbally, but on occasion physically. Regarding Father, Mother portrays him as inflexible and regimented, not being "connected" with the minor children. Mother believes William wants someone to talk to and has sought Mother out for this purpose on numerous occasions. Father is a person of few words.

Mother believes she can provide a proper household for William. Her husband, William Gotshall, is very invested in William's care and provides a strong paternal influence for William. Also present in the house is Mother's daughter from her marriage to Mr. Drumheller and Mr. Gotshall's daughter, both of whom have a good relationship with William. Mother stresses proper attention to education and accountability for her children. Both of the girls maintain high grades at school. All the children have chores, which they are required to do.

Mother, her family and William participate in a number of activities, including attending football games (the girls are cheerleaders), going out for pizza, attending church, and participating in other family outings.

The parties have very little communication. When they do communicate, it is primarily by correspondence. Mother places the blame for this upon Father. Mother

also believes that William has been restricted by Father from calling on the telephone to discuss matters.

Father's presentation was straightforward. He testified that he has cared for the minor children since the separation and has provided a good household for them. Father states his household is stable and consistent. He maintains rules and a curfew. He and the minor children are very used to their weekly routine.

He and the boys both enjoy working together on the paternal grandmother's farm. Since his father died, Father has been responsible for the farming activities. He and the boys spend a great deal of time there. Additionally, he and William both enjoy scouting. They attend meetings on Sunday evenings, as well as periodic meetings during the week, and activities during the summer.

According to Father, Mother is unreliable, particularly during her marriage to Mr. Drumheller. Through her bad choices, the minor children were placed at risk for an extended time and both of them, particularly Jonathan, continue to manifest psychological scars.

Father does not believe that William wants to live with Mother. He claims that this issue arose through Mother's attempting to influence William. Father notes Mother's extremely poor relationship with Jonathan as a motivation to attempt to pull William toward her and from Father and his stable household.

In essence, Father sees Mother as divisive. It was she who separated from him back in 1995. It was she who exposed the minor children to Mr. Drumheller, resulting in the abuse inflicted upon them and the hard feelings between her and Jonathan. It is now she who is attempt-

ing to further divide his household by convincing William that he would be better off living with Mother in Shenandoah.

Father has concerns about the upheaval in William's life, should there be a custody change. William would have to change schools and start over. He would have to make new friends. His normal weekly routine, including potentially his time at the family farm or at Boy Scouts, would be compromised.

Regarding the relationship between Jonathan and William, Father acknowledges that there is some friction, but believes this is the usual type of competition/camaraderie/hazing that goes on between brothers. He does admit that the arguments can become quite heated, stating that on one occasion an argument between the brothers caused him to emotionally break down.

Father also acknowledges that William is having some problems in school but does not believe these problems are in any way connected to the custody issues of this case or his lack of communication with his son, but rather is a temporary phase that William is going through. In any event, moving him to a brand new school with a new curriculum would not result in a positive change.

Dr. Thomas provided a good summary of the parties and the minor children. Dr. Thomas described Father as a "fairly intense individual who communicates rather briefly, is rather emotionally closed and has a significant undercurrent of anger to his presentation." The anger appears, in part, to be directed toward Mother and his perception of her divisive actions and, in part, from his reluctance to be involved in litigation or with a psychologist doing an evaluation. Dr. Thomas also notes a

"rigid quality" to Father's thinking in his approach to life. Because of his personality, Father is not warm or affective, nor emotionally expressive. His personality structure will not promote relationship events or interpersonal bonding. He is stronger when bonding through activity and shared experience. Regarding parenting style or capacity, Father's interventions tend to be brief, a simple consequence in response to misbehavior. Dr. Thomas would not be surprised if Father would behave in an angry fashion toward his children periodically.

Regarding Mother, Dr. Thomas found that Mother did attempt to present an unrealistically positive picture of herself but he, nevertheless, found her to be emotionally "open and expressive." Her personality structure provides fairly good abilities for attachment. She emphasizes communication. However, she can be dependent or defensive. She unfortunately minimizes the negative role of Mr. Drumheller and underestimates the impact of that on Jonathan. She can make excuses rather than taking responsibility. She has problems with self esteem. She is not a very powerful person in a relationship. Overall, Dr. Thomas finds the bond between Mother and William to be positive, suffering to some extent by the limited contact and emotional events in Mother's life.

Regarding her parenting capacity, Mother has a fairly good potential for nurturing and is quite responsive. She will likely do better at accessing outside supports than will Father. However, Dr. Thomas perceives that Mr. Gotshall has a fairly strong personality and may take over and run the household, even in situations involving custody of William.

Regarding the boys, Dr. Thomas states:

"(4) Both these boys are struggling to some degree. Jonathan Stoudt's emotional distress was readily apparent. Now, many years after the beginning of these family disputes, he remains very angry and very distraught. His relationship with his mother is dysfunctional. A previous evaluator had indicated that Father influenced Jonathan negatively against Mother, behaviors that Jonathan and Father both currently deny. In fact, Jonathan seems very removed from both parents and shows a wish to further withdraw from all of this conflict. This is of great concern. Jonathan is struggling. Jonathan does not have close, successful relationships with either parent to help support him as he completes high school and tries to develop a life program of his own. At age 17, it is appropriate for Jonathan to be the primary individual who determines his course with regard to residence and custodial contacts. He clearly wants to continue in the program that he currently experiences. It would be a disaster to try to force him to live with Mother or to force extended time between Jonathan and Mother. In this setting, they had tremendous difficulty relating, even for a short period of time. Clearly, there is a need for some attempt to repair this relationship and to deal with the long-term effects of this relationship. Mother and son need counseling. It is not, however, appropriate for the court to order this. Jonathan would only resist that. Instead, [Mother] should be fully aware of the need for the ongoing counseling between her and Jonathan. Father should be aware of this need and support it. Mother and Jonathan should continue to negotiate until Jonathan would be ready to accept such a proposal. William also

struggles. His grades and school behavior show mild indications of his dysfunction. His anger was evident during these interviews when he was examined. He affirms that he was mistreated by Mr. Drumheller, albeit much less so than Jonathan. I believe that William's distress is significant. William expresses a wish to live with Mother."

Dr. Thomas also notes that the driving time between the parties' households is a significant problem, eliminating opportunity for frequent easy exchange of William. Also of concern is the conflict between Jonathan and William. There appears to be a development of an alliance of Jonathan and Father opposing Mother, while William is, in turn, aligning with Mother. This could result in the boys acting out some of the parental conflict. Dr. Thomas notes that when Jonathan leaves the home, which will likely occur in the fall of 2007, this may be a positive for William.

In recommending that William reside with Mother, Dr. Thomas believes that William's wish to live with his Mother is sincere, also believing that he is seeking emotional support from Mother. Further, the relationship with Jonathan is highly troubled. On the other hand, moving William would contravene his long-standing establishment in a school system network of friends and interests, including flying, and familiarity with the people in Schuylkill Valley. Further, sometimes his relationship with Jonathan can be positive. Ultimately, Dr. Thomas believes that the most important element is for William to emotionally attach to his Mother and receive a warm and positive emotional experience from her that he cannot receive from his Father. Also it would be a positive

for him not to be around Jonathan during the week. Accordingly, Dr. Thomas recommended that William reside primarily with Mother, with Father to have two out of every four weekends, and with the summer program to continue on a 50/50 basis.

The paramount concern in a child custody proceeding is the best interests of the minor child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

This analysis requires a balancing of substantial competing interests. On the one hand, Father has provided continuity and stability for an extended period of time. Routines and schedules have been established. The schedules have been workable and able to accommodate the minor child's interests, particularly Boy Scouts, even though the parties live a substantial distance apart. The minor child is firmly rooted in the Schuylkill Valley School system with an established network of friends. On the other hand, Mother would be able to provide a more active and engaging family unit. She would be available for emotional support for William.

We are also mindful that a change in custody would impact on the school months only, as the parties have agreed to continue the shared 50/50 custody arrangement in the summer months. Further, to the extent a separation from Jonathan is necessary, a modification would accomplish this during the school week, but conversely

there would be more interaction between the brothers during the weekends. Additionally, in subsequent school years, Jonathan will be attending college and will be eventually moving on and starting his own life. The issues Mother raises regarding Jonathan are basically limited to the 2006-2007 school year.

In essence, Mother's basis for requesting a change in custody are threefold: (1) the negative impact of the relationship of the brothers, (2) that Mother can provide emotional support for William, while Father is constricted, and (3) the child's stated preference. Upon review of the testimony, we find that, on balance, these concerns do not warrant changing the existing custodial arrangement.

The concerns about Jonathan appear overblown. It is true that Jonathan appears to "pick" on his brother. This, unfortunately, is an all too common byproduct of sibling rivalry, which in this case may be more intensive than usual, but does not rise to the level of abuse. In fact, on many occasions, the boys get along well with each other. Secondly, changing the custody arrangement does not resolve this issue, but merely transfers contact between the brothers from the weekdays to the weekend. Arguably, the boys may spend more time together under Mother's proposed arrangement. Third, as already stated, the issues involving Jonathan are only pertinent until the end of the 2006-2007 school year. Fourth, a transfer on this basis could unfortunately foster the growing estrangement among the parties and Jonathan, driving the parents and the children into two "camps".

Mother presents a stronger argument on the issue of William's emotional needs. As Dr. Thomas points out,

openness and communication are two of Mother's strengths. She is willing and available to assist William in working out any issues he may have. William has responded, and seeks her out for advice. Conversely, Father's capacity to develop this type of relationship with William is quite limited. The question becomes whether it is necessary to modify the custody arrangement and uproot William from a stable and long-standing environment, in order to address William's emotional needs.

We believe it is not. William does receive quality time with Mother on weekends. Moreover, access to Mother and communication with her does not have to be limited to person-to-person contact. Telephone calls, or even e-mail, while not optimal, can nevertheless sufficiently address William's needs on a particular day. We are aware William was prevented from long distance contact with Mother because Father did not permit him to make long distance telephone calls and because there was some type of breakdown with Father's computer. From this day forward, however, William should have the access he needs to discuss matters with Mother. The parties may want to look into purchasing a cellular telephone for William, with free unlimited minutes after certain times, if long distance telephone calls from the land line are cost prohibitive. The e-mail solution is also helpful, but is the least attractive alternative when William has needs to be addressed, because it does not provide the interactive person-to-person contact. On the other hand, when the contact is for informational purposes, the e-mail will certainly suffice.

The third issue, William's preference, does not exist independently of the first two issues. Both Mother and

Dr. Thomas reported that William has informed them of his desire to reside with Mother. The problems he has with Jonathan is the reason he gave. This court finds that William finds positive reasons for residing in either household. If you remove the interaction between the brothers as a factor, then the evidence does not support Mother's belief that there is a preference.

After giving the factors raised by Mother appropriate weight, it does not appear, for the reasons set forth, that William's quality of life would be substantially improved by the move, when you take into account the adverse impact which would occur if the child is moved from the home, the school district and the lifestyle he knows. In custody decisions, the court must consider the importance of continuity in a child's life and the desirability of development of a stable relationship with established parental figures and a known physical environment. *Wiseman v. Wall,* 718 A.2d 844, 850 (Pa. Super. 1998). Courts are reluctant to disturb existing custody arrangements which have satisfactorily served the best interests of the child. *Wiseman, supra,* 718 A.2d at 846. Further, where natural parents are both fit, the court must give positive consideration to the parent who has been the primary caretaker. *Fisher v. Fisher,* 370 Pa. Super. 87, 91, 535 A.2d 1163, 1165 (1988).

We find that continuity and stability are factors which override the factors raised by Mother, in part because Mother's concerns are either of short duration or can be addressed in another manner, while a change in custody would substantially and permanently affect the child's welfare.

There is also a legitimate concern, already mentioned, of the increasing estrangement of family members. Mother and Father continue to harbor resentment toward each other. Neither trusts the other. Jonathan does not trust his Mother. William, on the other hand, has a good relationship with both parents. It would be unfortunate, and harmful to William, if he were forced to choose sides.

Modifying custody would also have an adverse impact on William's activity schedule. Currently, he spends Sunday evenings, and some weekday evenings at Boy Scouts with his father. The current arrangement is that he leaves his mother's house Sunday evening around 5 p.m. to attend the Boy Scouts meeting. If Mother was the primary custodian, with Father having three weekends of the month, it would require William to travel to Shenandoah at the conclusion of the Boy Scouts meeting. He may not arrive home until 10 p.m. or 10:30 p.m. Another activity he would have to forgo is the time he would spend on his grandmother's farm during the weekdays.

We advise the parties that the decision in this matter is a close one. The court would have liked the opportunity to increase Mother's time by awarding her one evening per week, in addition to her three weekends, however, that is not feasible. The distance between the households, and the need for Mother to be available for her husband, her daughter and stepdaughter militates against such an award. The parties' estrangement is also a countervailing factor. Accordingly, this court will leave the present custody arrangement undisturbed. We enter the following order:

## ORDER

And now, October 10, 2006, after trial held, custody of the parties' minor child, William Robert Stoudt, born August 3, 1993, shall be as follows:

(1) The parties shall share legal custody.

(2) Defendant, David J. Stoudt (Father), shall have primary physical custody of the minor child.

(3) Plaintiff, Cherie M. Gotshall (Mother), shall have partial physical custody three weekends each month from Friday at 5 p.m. until Sunday at 5 p.m., the weekends to continue in accordance with the schedule already established by the parties, pursuant to the orders of court entered September 26, 2000 and October 28, 2005.

(4) All other terms and conditions of the order of September 26, 2000, shall remain in full force and effect.

(5) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate, nor permit to attempt to alienate, the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and

anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to

the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation. The parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.